DANIEL S. PEARSON, Judge.
PRN of Denver, Inc. (hereafter Denver), whose business it is to provide nurses to hospitals and private persons, sued Arthur J. Gallagher & Co. (Florida) (hereafter Gallagher), the insurance agent of PRN, Inc., Denver’s predecessor. The complaint alleged that Gallagher had tortiously interfered with an advantageous business relationship between Denver and Larkin Hospital, one of Denver’s customers. The heart of Denver’s claim was that Gallagher had wrongfully advised Larkin that the malpractice insurance covering Denver’s nurses — understandably required by Larkin to be in full force and effect — was cancelled, causing Larkin to immediately stop using Denver’s nurses.
At the close of the presentation of Denver’s case, the trial court pretermitted the jury’s consideration of the case by granting the defendant’s motion for a directed verdict based on the following “findings of fact”:
“a. That this Court is [sic] finds that there is no obligation by Larkin Hospital to hire any nurses from PRN, INC. or PRN OF DENVER.
“b. That the Assistant Risk Manager of Larkin Hospital, Regina Noto stated that she did not want to get involved with PRN, INC.’S or PRN OF DENVER insurance problems and she had the right *1002 to terminate any temporary nursing service at any time.
“c. That in the herein cause there is no continuing expectation of business.
“d. That contingencies could and did effect [sic] the duration of the business.
“e. That the nature of PRN, INC.’S damages are purely speculative.
“f. Further, PRN, INC. ceased doing business on January 4, 1984.
“g. The word ‘cancel’ on the certificates of insurance and formal cancellation procedures were not sent by ARTHUR J. GALLAGHER & CO. until January 11, 1984.
“h. PRN OF DENVER began doing business subsequent to January 4th, 1984.
“i. PRN OF DENVER is not the successor corporation to PRN, INC.
“j. There were different stock holders of PRN, INC. and PRN OF DENVER.
“k. That PRN OF DENVER did not buy, or take over the good will of PRN, INC.”
The listed “findings” fall far short of supporting the trial court’s ruling. Some of them — although supported by selected pieces of the conflicting evidence in the case — represent, in our view, a fundamental misconception of the trial judge’s limited role in a jury trial and consequently a usurpation of the jury’s fact-finding function. For example, although it is true that Regina Noto, the head of the nursing department at Larkin Hospital, testified that she did not want to get involved with Denver’s insurance problems and had the right to terminate any temporary nursing service at any time, she also testified that the reason for terminating Larkin’s relationship with Denver was her belief that Denver’s insurance had been cancelled. And while, as the trial court found, contingencies could and did affect the duration of the business, the primary event that affected the duration of Denver’s business with Lar-kin was, in Noto’s words, “[b]ecause I believed they weren’t covered with insur-anee.”[1] That belief, the jury could have concluded from at least some of the evidence, was reasonably based on Gallagher’s notice to Larkin that cancellation occurred on January 11, 1984, notwithstanding that the insurance was actually in force for an additional ten-day period during which, if necessary, other insurance could have been arranged.
The order under review is erroneous for another reason. The court apparently concluded as a matter of law that lost profits could not be recovered based upon the profits of a predecessor business, regardless of the similarities between the two businesses. Because of this conclusion, the court disregarded evidence of the similarities between PRN, Inc. and PRN of Denver, Inc., and instead focused on the separateness of the two entities. Thus, while the court correctly noted that PRN, Inc. ceased doing business on January 4, 1984, that Denver began doing business after January 4, 1984, that the stockholders of Denver and PRN were different, and that Denver did not buy or take over the good will of PRN, the court ignored evidence which shows that since 1976, Mr. and Mrs. Willard Wendt, the owners and operators of Denver, operated PRN, Inc. and as of 1983 owned one-half of it, with Gail Miller owning the other half. The Wendts ran PRN’s Miami office, Miller ran the West Palm Beach office, and PRN employed a manager to run the Fort Lauderdale office. When a dispute between the Wendts and Miller arose, PRN, Inc. ceased doing business, and with uninterrupted succession its accounts were transferred to PRN of Denver, Inc. (a company owned and operated by the Wendts since 1980), which had formerly engaged in the same business in Denver and Colorado Springs, Colorado only. PRN of Denver, Inc. continued the Miami and Fort Lauderdale operations, the nursing staff assembled by PRN, Inc. began working for PRN of Denver, Inc., and the employees in the Miami and Fort Laud-erdale offices remained the same and used *1003 the same facilities and equipment. In essence, as the appellant argues: “[I]n the Miami and Fort Lauderdale offices, Willard and Jessie Wendt were PRN. By whatever name, the Wendts operated the Miami and Fort Lauderdale offices with the same employees, the same office space, and the same customers exactly as before.” Indeed, until the insurance brouhaha, Larkin Hospital, PRN’s principal client, was unaware of any difference between PRN, Inc. and PRN of Denver, Inc. This evidence, establishing that PRN, Inc. and PRN of Denver, Inc. were functional equivalents of each other, undermines the trial court’s conclusion that Denver’s proof of lost profits was entirely too speculative to support its claim.
Denver concedes that the usual predicate for a commercial business’s claim of lost profits is a history of profits for a reasonable period of time anterior to the interruption of the business. However, a claimant’s prior experience in owning or managing the same type of business — as is quintessential^ the case here — satisfies the claimant’s burden of proof, Wash-Bowl, Inc. v. Wroton, 432 So.2d 766, 767 (Fla. 2d DCA 1983), appeal after remand, 456 So.2d 967 (Fla. 2d DCA 1984), since these are “facts of an equivalent import” to proof of an anterior profit history of the same company. New Amsterdam Casualty Co. v. Utility Battery Mfg. Co., 122 Fla. 718, 727, 166 So. 856, 860 (1935). See Wharfside Two, Ltd. v. W. W. Gay Mechanical Contractor, Inc., 523 So.2d 193 (Fla. 1st DCA 1988); R.A. Jones & Sons, Inc. v. Holman, 470 So.2d 60, 69-70 (Fla. 3d DCA 1985); Polyglycoat Corp. v. Hirsch Distributors, Inc., 442 So.2d 958 (Fla. 4th DCA 1983); A & P Bakery Supply & Equipment Co. v. Hawatmeh, 388 So.2d 1071 (Fla. 3d DCA 1980). If, as this court held in Jayess Investments, Ltd. v. Barbee ■Foods, Inc., 155 So.2d 853 (Fla. 3d DCA 1963), the operator of a hotel coffee shop who is wrongfully evicted from the premises after a mere two weeks of operation may prove his loss of profits by establishing the profits of his predecessor whose fifteen-month operation of the coffee shop was similar in every respect, then, a fortio-ri, PRN of Denver, Inc., a successor whose operation and operators are the same as its predecessor, may prove its loss of profits in the same manner without running afoul of the rule prohibiting the recovery of purely speculative damages.
Finally, although it is true that Lar-kin Hospital was under no obligation to hire any nurses from PRN or Denver, the tort of interference with an advantageous business relationship does not require that the relationship be evidenced by an enforceable contract. Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126 (Fla.1985); United Yacht Brokers, Inc. v. Gillespie, 377 So.2d 668 (Fla.1979); Calvary Church, Inc. v. Siegel, 358 So.2d 1134 (Fla. 3d DCA 1978); Allen v. Leybourne, 190 So.2d 825 (Fla. 3d DCA 1966).
Accordingly, the order granting Gallagher’s motion for directed verdict and entering judgment for Gallagher is reversed and the cause remanded to the trial court for a new trial.
REVERSED AND REMANDED.

. Even had Noto not said so, we think the jury could have found from the coincidence of Lar-kin’s learning of the insurance cancellation and its termination of Denver that the former was a principal cause of the latter.